UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

RICHARD SPAGNUALO,

                            Petitioner,

            v.                                                9:20-CV-0663
                                                              (MAD/TWD)

GEORGE JONES,

                            Respondent.

_____

APPEARANCES:                              OF COUNSEL:

RICHARD SPAGNUALO
Petitioner, pro se
14-B-3313
Cayuga Correctional Facility
P.O. Box 1186
Moravia, NY 13118

HON. LETITIA JAMES                        JAMES FOSTER GIBBONS, ESQ.
Attorney for Respondent                   Ass't Attorney General
New York State Attorney General
The Capitol
Albany, New York 12224

THÉRÈSE WILEY DANCKS
United States Magistrate Judge

**REPORT-RECOMMENDATION and ORDER**

I.   **INTRODUCTION**

        Petitioner Richard Spagnualo ("Petitioner") seeks federal habeas corpus relief

pursuant to 28 U.S.C. § 2254.  Dkt. No. 1, Petition ("Pet.").  Respondent successfully

requested three extensions of time to file a response and permission to file an oversized

brief.  Dkt. No. 5, 7, 9, Letter Motions (requesting an extension of time); Dkt. No. 6, 8,

10, Text Order (granting requests); Dkt. No. 11, Letter Motion (requesting to file an oversized brief); Dkt. No. 12, Text Order (granting request). Respondent submitted a response. Dkt. No. 13, Response; Dkt. No. 13-1, Memorandum of Law in Opposition to Petition; Dkt. No. 14, State Court Record ("SR"); Dkt. No. 14-1–4, Transcripts.

## II.    RELEVANT BACKGROUND

### A. Indictment

In an Indictment filed December 8, 2014, Petitioner was charged with: Attempted Arson in the Second Degree, in violation of N.Y. PENAL LAW ("P.L.") § 110.00/150.15; two counts of Criminal Possession of a Weapon in the Second Degree, in violation of P.L. §§ 265.03(1)(b) and 265.03(3); Reckless Endangerment in the First Degree, in violation of P.L. § 120.25; Criminal Mischief in the Fourth Degree, in violation of P.L. § 145.00(1); and Criminal Solicitation in the Fifth Degree, in violation of P.L. § 100.00. SR 53-54. The Grand Jury found, on or about September 2, 2014, multiple defendants– including Petitioner –aiding and abetting and being aided and abetted by each other:

> [A]ttempted to intentionally cause damage to a building at 8584 Weaver Road by starting a fire and . . . another person . . . who w[as] not [a] participant[] in the crime w[as] present in such building . . . and . . . [the] defendants knew that fact or . . . the circumstances were such as to render the presence of such a person therein a reasonable possibility[;] . . .
> [P]ossessed a loaded firearm intending to use the same unlawfully against Matthew Luke, to wit: a loaded shotgun with a barrel length of less than 18 inches[;] . . .
> [P]ossessed a loaded firearm at a place other than their home or place of business, to wit: a loaded shotgun with a barrel length of less than 18 inches[;] . . . under circumstances evincing a depraved indifference to human life, recklessly engaged in conduct which created a grave risk of death to another person . . . by firing a loaded shotgun at an occupied residence[; and] . . .

> [H]aving no right to do so nor any reasonable ground to
> believe that they had such right, intentionally caused
> damage to the property of Matthew Luke . . . by firing a
> loaded shotgun at his residence and causing damage to the
> siding of the residence.

SR 53-54.  The Grand Jury also found Petitioner intentionally "solicited, requested,

commanded, importuned or otherwise attempted to cause" another individual, "John

Kosmetatos[,] to engage in" conduct constituting a crime.  SR 54.

### B.  Jury Trial

Petitioner's jury trial commenced on February 22, 2016, in Onondaga County

Supreme Court ("the court" or "trial court") before Hon. Justice John J. Brunetti.  Dkt.

No. 14-1 at 1.  Only the facts and testimony relevant to the instant action will be

discussed in detail.

#### 1.  The People's Case

The Assistant District Attorney ("A.D.A.") first called Matthew Luke to testify.  Dkt.

No. 14-2 at 10.  Luke identified the Petitioner by name and testified he had known

Petitioner for twenty years at the time of trial.  *Id*. at 24-25.  Luke explained his

friendship with Petitioner had terminated after "a number of falling outs" including

disputes over employment and money.  *Id*. at 25.  Luke stated he was aware Petitioner

thought Luke owed Petitioner money and explained, on multiple occasions between

2009 and 2014, Petitioner had "said things to friends" and "passed messages" in an

attempt to collect money from Luke.  *Id*. at 37-38.

Luke testified he was sleeping on the couch at his residence– located at 8584

Weaver Road in Cicero –on September 2, 2014, around 3:30 a.m., when he was

awoken by a "loud, [sic], bang and crunching metallic sound."  Dkt. No. 14-2 at 12-13.

Luke explained he "couldn't see anybody" and "didn't hear anybody" when he opened the door but "could smell" a scent which the witness identified as similar to "propellant, gunpowder, [or] burning fireworks[.]" *Id*. at 13. The witness testified the following day, his fiancée "found some lighter fluid in a canister with some more burnt matches and stuff next to it" outside of the residence. *Id*. at 17.

Joshua Soble testified he was aware of an ongoing dispute between Petitioner and Luke. Dkt. No. 14-2 at 81-82. Around 1:00 a.m. on September 2, 2014, Soble testified he and Petitioner went from a friend's apartment to Petitioner's cousin's home "[t]o look at guns." *Id*. at 85-87. Soble recalled an individual named John Kosmetatos, who the witness had not previously known, and Anthony Donze were also present at Petitioner's cousin's house. *Id*. at 87-88. Soble testified Kosmetatos asked the pair if they wished to purchase the "sawed-off shotgun with a pistol grip with duct tape around it" on the porch, but Petitioner declined to purchase the shotgun "[b]ecause it was junk." *Id*. at 88-89.

When Petitioner declined to purchase the gun, Soble testified "Kosmetatos asked us if we needed any work done, like, if we needed anybody killed." Dkt. No. 14-2 at 90. The witness testified he did not answer but Petitioner and Kosmetatos "walked away from the table and talked . . . [a]bout fifteen feet [away], while [the witness] talked to [Donze]." *Id*. Soble stated the conversation continued for "[a] few minutes" but he was unable to hear what Petitioner and Kosmetatos had said. *Id*. Following said conversation, Soble recalled "[h]e and [Petitioner] got into [a] white Cadillac CTS, and [Donze] and Kosmetatos got into [a] purple Cadillac CTS" then "drove to Nice-N-Easy on South Bay and 31." *Id*. at 91.

During the drive to Nice-N-Easy, Petitioner told Soble "he was gonna pay Kosmetatos to go to . . . Luke's house to make a mark, to mess it up."  Dkt. No. 14-2 at 91.  The prosecutor asked the witness to elaborate and Soble explained "[e]ither if he was home, he wanted him killed. If not, he wanted him to mess up his house."  *Id*. at 92. Soble explained he understood the phrase "mess up his house" to mean "[m]ake a mark" or "shoot at the house, maybe break windows."  *Id*.

Soble testified he talked with Petitioner more after they arrived at Nice-N-Easy, then the other Cadillac arrived and Petitioner spoke with Kosmetatos.  Dkt. No. 14-2 at 92.  The witness also testified he had a conversation with Petitioner and Donze at a table located in the front of the store, during which Donze told Petitioner and Soble "Kosmetatos was really gonna do this . . . Was either gonna kill him or destroy his house."  *Id*. at 93.  Soble further testified Petitioner had "[a] few hundred" dollars in his possession and withdrew an additional "two hundred" dollars from an ATM located within the Nice-N-Easy.  *Id*. at 93-34.

Next, Soble testified the individuals exited the store, returning to the cars they had arrived in, and "drove down 31 to Torchwood and went over to . . . Luke's house." Dkt. No. 14-2 at 94.  The witness recounted the route traveled to Luke's house, explaining Petitioner drove the white Cadillac the witness rode in and the other Cadillac followed behind the entire way.  *Id*. at 94-96.  Soble stated he and Petitioner did not discuss what was going to happen at Luke's house further because they "didn't know if he was home or not."  *Id*. at 99.  Soble testified Petitioner identified Luke's house to the passengers in the other Cadillac by indicating with his hand out the car's window and

explained "as soon as we s[aw] Kosmetatos getting out with the shotgun, we left." *Id*. at 96-97.

After observing Kosmetatos exit the other vehicle, Soble stated he and Petitioner drove back to the Nice-N-Easy.  Dkt. No. 14-2 at 97.  During the drive, Petitioner told Soble he was going to pay Kosmetatos "five hundred dollars if he messed [Luke's] house up." *Id*.  Soble testified Petitioner did not tell Soble whether he would pay Kosmetatos a greater amount if Kosmetatos killed Luke. *Id*.  The witness explained he and Petitioner entered the Nice-N-Easy and Kosmetatos entered the store "shortly [there]after." *Id*. at 98.  Soble testified "[Petitioner] gave Kosmetatos money, and then we left." *Id*.  The witness specified he "s[aw] the money but [he] wasn't exactly sure how much was there" because when Petitioner handed Kosmetatos the money "he had it all rolled up[.]" *Id*. at 100.

Soble testified Kosmetatos thanked Petitioner and "said, nice doing business with ya," then went to purchase cigarettes as Petitioner and Soble exited.  Dkt. No. 14-2 at 101.  Soble and Petitioner then returned to North Syracuse and did not discuss the evening's events further. *Id*.  "[A]bout a week later[,]" Soble testified he met with Petitioner and Donze in person– after "Investigators talked to [Donze]" –at Donze's apartment "and . . . came up with a story." *Id*. at 101-02.  The witness explained the three men planned to tell the police "we just went [to the Nice-N-Easy] to give [Donze] money and then drove down the street and came back" if questioned. *Id*. at 102.

The prosecutor played video footage from the Nice-N-Easy from September 2, 2014, staring at 3:18 a.m., and Soble identified Petitioner and "Donze" and explained an ATM was located near where Petitioner stood.  Dkt. No. 14-2 at 103.  The A.D.A. played

a later portion of the video footage, captured between 3:37 and 3:39 a.m., and Soble explained the video showed himself and Petitioner entering the store, followed by Donze, a girl, and Kosmetatos.  *Id*. at 103-04.

Soble testified he met with Detectives from the Syracuse Police Department and Onondaga County Sheriff's Office on October 8, 2014, and was questioned about the events of September 2, 2014.  Dkt. No. 14-2 at 107.  Soble stated he did not tell the detectives everything he knew and instead "told them the story that we came up with at . . . Donze's house . . . Because [Soble] didn't want [Petitioner] to get in trouble."  *Id*. Soble testified he was incarcerated and spent five months in jail after meeting with the detectives; had charges for two counts of both Burglary in the third Degree and Grand Larceny in the Fourth Degree pending at the time of trial; and "was under the understanding that [he] would get a reduction [to misdemeanor charges] for [his] truthful testimony."  *Id*. at 108.

Defense counsel cross-examined Soble, inquiring about his relationship with Petitioner.  Dkt. No. 14-2 at 110-11.  Soble agreed he had used cocaine and heroin the night of the incident but stated he could remember what had occurred.  *Id*. at 112.  The witness explained he was questioned about the incident after his arrest on an unrelated burglary charges.  *Id*. at 113-14.  Soble admitted, in addition to the Burglary and Grand Larceny charges, he also had unrelated charges for Criminal Possession of Stolen Property, Criminal Mischief, and Petit Larceny pending at the time of trial.  *Id*. at 114-16.

Soble testified he was aware he faced incarceration in state prison for the pending charges and "felt upset" about the prospect of imprisonment.  Dkt. No. 14-2 at 116-17.  The witness explained his attorney advised him of an offer which would allow

him to avoid state prison after Soble had spent four months in the county's custody.  *Id*. at 118.  Soble stated he was promised "a reduction from felonies to misdemeanors" in exchange for his testimony and agreed with defense counsel's assertion "that if [Soble] ratted out [his] friend[, Petitioner, Soble] could get more lenient treatment[.]"  *Id*. at 119.

Soble admitted he lied to Onondaga County Sheriff's Department Detective Seeber during the October 8, 2014, interview.  Dkt. No. 14-2 at 120-21.  Soble also described Petitioner's relationship with Luke as "[n]ot good" because "Luke took a motorcycle from [Petitioner]" and owed Petitioner money.  *Id*. at 122.  The witness testified he was also aware "Luke [had] intentionally struck [Petitioner] while he was riding his motorcycle" and Petitioner broke his femur and was hospitalized for approximately one month as a result.  *Id*. at 122-23.  However, the witness stated he was unsure whether he told Detective Seeber about said incident and may have merely told police Petitioner and Luke "had arguments[.]"  *Id*. at 123-24.

Soble admitted he told the detective he did not know about the transaction between Petitioner and Donze, which was not true.  Dkt. No. 14-2 at 125.  Turning to the conversation which occurred between Petitioner and Donze at Nice-N-Easy, Soble stated he did not participate, but overheard it, as he was standing nearby, and recalled hearing "[t]hat Kosmetatos was really gonna do this . . . Was really either gonna go to the house and hurt [Luke] or go destroy his house."  *Id*. at 126-28.  Soble clarified neither Petitioner nor Donze specified the price Petitioner would pay Kosmetatos, rather, Soble later learned Petitioner planned to pay Kosmetatos from Petitioner himself.  *Id*. at 128.

The witness answered it was his understanding Petitioner would pay Kosmetatos five hundred dollars if Kosmetatos "mess[ed] up [Luke's] house" but the price would be "different if he killed him."  Dkt. No. 14-2 at 128.  Soble admitted he did not instruct his friend to abandon the plan, explaining "I didn't really go along with it but I was there, yes. I was in a really bad situation at that point."  *Id*. at 128-29.  Soble further testified Detective Seeber had asked him to make a written statement, but he refused.  *Id*. at 129.

Soble agreed he never heard any conversation between Petitioner and Kosmetatos, such as an offer of money or a request to kill Luke or cause damage to his house.  Dkt. No. 14-2 at 132.  The witness clarified his knowledge of the arrangement was based on what "[Petitioner] told [Soble] personally . . . [w]hen we were in the car." *Id*. at 132-33.  Soble testified when he and Petitioner returned to Nice-N-Easy after leaving Luke's house, Soble "watched [Petitioner] hand a rolled up thing of money to Kosmetatos" and, while the witness was not able to identify the amount of money, Petitioner had told Soble it would be five hundred dollars.  *Id*. at 133-34.  Soble stated neither Donze nor Kosmetatos specifically told the witness what they had done to Luke's house.  *Id*. at 134.

On re-direct examination, Soble testified he was not present at the time of Petitioner's motorcycle accident, rather, the witness had learned about the incident from Petitioner.  Dkt. No. 14-2 at 135.  Soble stated he told the police he did not know what happened on September 2, 2014, "[b]ecause [the witness] didn't want [Petitioner] to get in trouble" and was further concerned because he was aware detectives had been investigating a murder committed by Kosmetatos.  *Id*. at 136.  Finally, Soble explained

none of his statements to police were made under oath, nor did he ever sign a statement under penalty of perjury. *Id*. However, on re-cross examination, Soble admitted the police instructed him to be truthful during the interview. *Id*. at 137.

Nichole Cross testified she was charged with "Murder in the Second Degree" and "multiple" other offenses related to said murder charge after she lured a victim towards her then boyfriend– Kosmetatos – who stabbed the victim because they "needed a car[.]" Dkt. No. 14-2 at 139-42. Cross explained she was promised a sentence of twenty years' incarceration in exchange for a plea of guilty to Robbery in the First Degree and cooperation against "Kosmetatos and [other] co-defendants." *Id*. at 139-40. Cross testified after she and Kosmetatos stole the victim's red Cadillac, they drove to pick up Kosmetatos' cousin, Danielle Cummings, and Cummings' boyfriend. *Id*. at 142-43. Cummings and her boyfriend provided directions to a house in Cicero where Kosmetatos planned to make some money by selling his gun. *Id*. at 142-43.

Cross testified she observed "a white Cadillac and two guys" whom she had not seen before at the house. Dkt. No. 14-2 at 144-45. The witness identified Petitioner as one of the individuals. *Id*. at 145. Cross explained Kosmetatos and Cummings' boyfriend exited the red Cadillac to attempt to sell the shotgun while she remained inside the vehicle. *Id*.

After Kosmetatos was unsuccessful in selling the shotgun, Cross explained Kosmetatos and Cummings' boyfriend returned to the vehicle and Cross followed a "white Cadillac" driven by Petitioner "to a Nice-N-Easy Gas Station." Dkt. No. 14-2 at 146. Cross testified she did not overhear any conversations which occurred inside of the Nice-N-Easy, then everyone returned to their respective vehicles. *Id*. at 146-47.

Cross explained she "followed the white Cadillac" again to a house in Cicero.  *Id*. at 147-48.  The witness stated she knew which house to stop at because Petitioner "pressed on his brake" which caused the vehicle's lights to "blink[.]"  *Id*. at 148-49.

Cross testified the white Cadillac left the area as she drove the stolen vehicle into a driveway to turn around then parked on the side of the street.  Dkt. No. 14-2 at 149-50.  Cross stated she saw Kosmetatos exit the vehicle, pour lighter fluid around the front of the house, and walk around to the back of the house.  *Id*. at 150.  The house did not light on fire; therefore, Kosmetatos returned to the car, picked up the shotgun, and fired two shots "towards the front of the house."  *Id*. at 151.  After firing, Kosmetatos returned to the car and Cross "sped off" as the other passengers provided directions back to the Nice-N-Easy store.  *Id*. at 151-52.

Cross testified Kosmetatos exited the car, entered the Nice-N-Easy, and returned with money to purchase gas and cigarettes.  Dkt. No. 14-2 at 152.  The witness identified various individuals depicted in portions of video footage from Nice-N-Easy.  *Id*. at 153-54.  After leaving Nice-N-Easy, and Kosmetatos dropped off Cummings and her boyfriend at a motel, then left Syracuse and drove to Brooklyn in the stolen vehicle.  *Id*. at 154-55.  Cross and Kosmetatos were arrested in Brooklyn on September 4, 2014.  *Id*. at 155.

On cross-examination, Cross admitted she "planned" to kill a man by pretending to be a hooker, picking up the man, and parking his car in a hidden location, explaining she "was on drugs" including "[s]pike[ and] cocaine."  Dkt. No. 14-2 at 156-58.  The witness testified she was high but able to remember everything.  *Id*. at 158.

Cross again stated she was not present for any conversations between Petitioner and Kosmetatos. Dkt. No. 14-2 at 159. The witness explained she was merely instructed to "follow the white Cadillac" but did not know where they were going or why. *Id*. at 159-60. Cross testified Kosmetatos retrieved the can of lighter fluid from the vehicle's trunk and the shotgun from the area of the front seat near the middle console. *Id*. at 161-62.

### 2.  Motion to Dismiss

After the People rested their case, defense counsel made a motion to dismiss the charge of Attempted Arson. Dkt. No. 14-2 at 195-96. Petitioner's attorney argued "attempt of arson is a specific intent crime" and the People presented "no proof . . . whatsoever that [Petitioner] solicited . . . Kosmetatos to commit an arson." *Id*. at 195. The A.D.A. responded "the proof did show that [Petitioner] agreed to pay Kosmetatos to either cause damage to . . . Luke's property or his person . . . or to kill him" therefore, Petitioner "did intend to cause damage to . . . Luke's property." *Id*. at 196. The trial court ruled it would not submit the charge for the lesser included offense of Criminal Solicitation to the jury then announced it would reserve on the remaining issues in the motion. *Id*. at 202-03.

The following morning, the parties returned and defense counsel announced Petitioner's intent to testify. Dkt. No. 14-3 at 3. The trial court repeated its *Sandoval* ruling:[1] the People would not be permitted to ask Petitioner about two prior convictions or the underlying acts. *Id*. Finally, Onondaga County Supreme Court granted

---

[1] *See generally*, *People v. Sandoval*, 34 N.Y.2d 371 (1974) (explaining the New York procedure under which a trial court determines whether evidence of prior convictions is admissible in the event a defendant testifies).

Petitioner's motion to dismiss the counts of Attempted Arson in the Second Degree and Reckless Endangerment in the First Degree. *Id*. at 4.

### 3. Petitioner's Case

Petitioner testified on his own behalf. Dkt. No. 14-3 at 7. Petitioner testified he was using heroin and cocaine with Soble at a friend's home on September 1, 2014, when he received a call from Donze. *Id*. at 8-11. Donze asked if Petitioner knew of anyone who would want to purchase a shotgun and Petitioner instructed Donze to meet him and Soble at Petitioner's cousin's house. *Id*. at 9-11. Petitioner stated he and Soble arrived at his cousin's house at approximately 2:00 a.m. on September 2, 2014. *Id*. at 10-11.

Petitioner testified his cousin was not home; therefore, Petitioner and Soble waited on the porch for the others to arrive. Dkt. No. 14-3 at 11-12. Donze arrived with "Kosmetatos and two girls" and Kosmetatos walked up to the porch, set a backpack down on a table, then "pulled the shotgun out of his pants." *Id*. at 12-13. Petitioner testified Kosmetatos "injected two shells into" the shotgun then "pumped it once[ a]nd pointed it up, like he was going to shoot it." *Id*. at 13.

Petitioner explained Kosmetatos "told [Petitioner] that [Kosmetatos] was gonna show [Petitioner] that [the shotgun] worked" but Petitioner instructed Kosmetatos "you can't shoot that thing off" and asked Donze "what's wrong with your buddy[?]" Dkt. No. 14-3 at 13-14. Petitioner testified he told Kosmetatos he did not want to purchase the "street sweeper" and Kosmetatos "got upset." *Id*. at 14. Petitioner explained they "started arguing" and Kosmetatos "told [Petitioner] he didn't drive all the way out here to Cicero for nothing, and somebody is buying the shotgun." *Id*. Donze interjected, telling

the two to relax and asked Petitioner if he could at least provide one hundred dollars, as Petitioner owed Donze money.  *Id*. at 15.

Petitioner testified he agreed to pay Donze the amount he was owed and instructed him to follow Petitioner to the gas station.  Dkt. No. 14-3 at 15-16.  Petitioner stated his friends were aware Petitioner had previously inherited a substantial amount of money.  *Id*. at 17.  Petitioner testified he drove to a Nice-N-Easy gas station, entered the store with Donze and Soble, and withdrew two hundred dollars from an ATM.  *Id*. at 18-19.  Petitioner recounted placing one hundred dollars on a table for Donze and then placing the remaining one hundred dollars in his pocket.  *Id*. at 19.

After accepting the money from Petitioner, Donze asked "if [Luke] still owed [Petitioner] money" because Luke had recently won money from racing motorcycles.  Dkt. No. 14-3 at 19-20.  When Petitioner confirmed Luke had not repaid Petitioner for the motorcycle, Petitioner stated Donze offered to "go down and collect that money for [Petitioner]," if Petitioner agreed to allow Donze to retain a portion of the funds.  *Id*. at 20.  Petitioner testified he had sold Luke a motorcycle in July of 2008 and asked Luke to repay him one hundred dollars per week, but Luke stopped making payments after Petitioner was injured in a motorcycle accident in August of 2008.  *Id*. at 20-22.

Petitioner described Donze's demeanor during the course of this conversation as "shaky . . . like he was nervous."  Dkt. No. 14-3 at 22.  Petitioner testified Kosmetatos was not present for the conversation, as he had remained "in the car outside the gas station[,]" nor was Soble, who was "off to the side" approximately "[f]ive feet away."  *Id*. at 23.  In response to Donze's offer to collect Luke's debt, Petitioner stated he "laughed" because he did not expect Luke would pay, but wished Donze "[g]ood luck" in his

attempt to collect the funds. *Id*. at 23-24.  Next, Donze asked where Luke lived then asked Petitioner to show Donze the location of Luke's home on Weaver Road. *Id*. at 24.  Petitioner testified he agreed and told Donze "I'll show it to y[ou], but I don't want a part of nothing, and I'm not sticking around to see anything. I'll show you where it is and I'm gone." *Id*. at 24.

Defense counsel asked Petitioner if Donze had "indicate[d] to [Petitioner] that he would engage in any measure to try to get this money" and Petitioner answered "[n]ever. I told him I didn't want to know nothing." Dkt. No. 14-3 at 24-25.  Petitioner further explained he thought "they were gonna go there and maybe scream, yell. He was gonna knock at the door, [Luke] was gonna come to the door, they were maybe gonna have a confrontation, [Donze] might threaten him . . . So [Petitioner] figured [Luke] would just give up some kind of money[.]" *Id*. at 25.  Petitioner recounted the route he drove from the Nice-N-Easy to Luke's residence and explained he "pumped the brakes to indicate that we were there[ and Soble] pointed the house out, out his window[.]" *Id*. Petitioner testified he turned his car around and drove back towards the other vehicle– containing Kosmetatos, Donze, and the two women –which had parked on the street. *Id*. at 25-26.

As he approached a stop sign, Petitioner "look[ed] in the mirrors, and . . . watched the passenger's side door open up and that's when . . . Kosmetatos got out of the vehicle." Dkt. No. 14-3 at 26.  Petitioner testified "[a]s soon as I'd seen him, I hit the gas and left." *Id*.  Petitioner stated he received a phone call from Donze on the drive back to Nice-N-Easy, during which Donze asked where Petitioner was, and Petitioner told Donze he had returned to Nice-N-Easy. *Id*. at 27.  Donze also requested to borrow

more money from Petitioner on the phone call and Petitioner "told [Donze] all [Petitioner had] left [wa]s sixty bucks." *Id*. at 28-29.

      Petitioner testified he entered the Nice-N-Easy with Soble and ordered sandwiches, then the other vehicle pulled in and Donze, Kosmetatos, and Cross entered the store. Dkt. No. 14-3 at 27-28. Petitioner recalled "[Donze] had really big eyes[ a]nd he sa[id], you're not gonna believe what just happened[,]" which caused Petitioner to believe "[Luke] got beat up[,]" but Donze clarified "[Luke] didn't even answer the door . . . this kid shot the house up" while pointing towards Kosmetatos. *Id*. at 28. Petitioner asked Kosmetatos if Donze's statement was true and Kosmetatos answered "yeah, I sent a message[,]" to which Petitioner responded "nobody asked you to send a message . . . I'm not paying you for that." *Id*. Petitioner stated Donze "intervened" and asked Petitioner to give Kosmetatos the sixty dollars Petitioner and Donze had discussed over the phone, which Petitioner did. *Id*. at 28-29.

      After getting paid, Kosmetatos and Cross purchased gas and cigarettes from the register, returned to their vehicle, and drove away. Dkt. No. 14-3 at 29. Petitioner testified he never saw Kosmetatos after he departed the store. *Id*. Petitioner described his answers during the Sheriff's Department's interview of him, portions of which were played for the jury during the People's case, as "[m]ostly" truthful and accurate. *Id*. at 31. Petitioner clarified it was his understanding that the subject of the interview would be "the attempted sale of the shotgun" rather than the events which occurred at Luke's home. *Id*.

      On cross-examination, Petitioner admitted he was, in fact, depicted in the video footage from Nice-N-Easy; he withdrew two hundred dollars from the ATM at Nice-N-

Easy; and gave one hundred dollars of the withdrawn money to Donze.  Dkt. No. 14-3 at
33.  Petitioner stated he had "owed [Donze] money for drugs" but did not know whether
Donze subsequently gave the one hundred dollars to Kosmetatos.  *Id*. at 34.  Petitioner
also confirmed Kosmetatos offered to sell Petitioner the shotgun "cheap" because
Kosmetatos "really needed money[.]"  *Id*. at 39.

Petitioner agreed he told police Kosmetatos was "weird[,]" testifying Kosmetatos
was "very cold" to the extent it scared Petitioner.  Dkt. No. 14-3 at 39.  Petitioner
confirmed he was aware Kosmetatos possessed a working shotgun, brass knuckles,
and a switchblade.  *Id*. at 38-40.  Petitioner testified he allowed Donze and Kosmetatos
to follow him despite this knowledge because Petitioner "was doing whatever [he] had to
do to get him away from [himself] and [Donze]."  *Id*. at 40.

Turning to Petitioner's conversation with Donze inside the Nice-N-Easy,
Petitioner repeated it was Donze who offered to collect the money Luke owed
Petitioner.  Dkt. No. 14-3 at 40-42.  Petitioner agreed he had sent Donze to Luke's
house, testifying "I pointed the house out. I showed them where to go."  *Id*. at 42.
However, Petitioner admitted he did not tell police about the money Luke owed him
during his interview.  *Id*. at 52-53.

Petitioner further admitted he had told police he planned to go to McDonald's
after leaving Nice-N-Easy– but later changed plans because "late night food was too
expensive and no good" –when, in fact, Petitioner had always planned to lead the other
Cadillac to Luke's house.  Dkt. No. 14-3 at 53-56.  Petitioner confirmed he had spoken
to Donze– who had already been interviewed by police –prior to Petitioner's own
interview on September 24, 2014; therefore, Petitioner was aware of the Nice-N-Easy

video footage.  *Id*. at 56.  The A.D.A. asked Petitioner if he "really thought that . . . Kosmetatos, who was[, in Petitioner's words,] crazy, wasn't going to use the shotgun to collect the debt" and Petitioner answered "I didn't send . . . Kosmetatos there. I sent [Donze] there."  *Id*. at 57.  Finally, Petitioner agreed he did not like Luke because the two "had bad blood" for several years prior to trial.  *Id*.

### 4.  Jury Instructions and Verdict

After the defense rested their case, the trial court excused the jury and asked the parties for any final charge requests.  Dkt. No. 14-3 at 59.  Defense counsel requested "the Court charge the jury regarding the missing witness rule" as to "Kosmetatos [and] . . . Donze[.]"  *Id*. at 59-60.

Onondaga County Supreme Court denied Petitioner's request as "tardy" because neither Kosmetatos nor Donze "w[ere] listed on the [People's] witness list[.]"  Dkt. No. 14-3 at 60.  Turning to the merits of Petitioner's request, the trial court asked "what relationship do[] . . . Kosmetatos or . . . Donze . . . bear to the Prosecution that would make it natural for them to support the position advanced by the Prosecution?" and defense counsel answered "Kosmetatos was a principal in th[e] offense" and "Donze . . . would have material information regarding conversations he had with [Petitioner] regarding th[e] alleged solicitation to commit this crime."  *Id*. at 60-61.  The A.D.A. responded Kosmetatos pled guilty to a number of offenses for his involvement in the matter and "Donze wasn't present" for the conversation during which Petitioner solicited Kosmetatos to commit the charged offenses.  *Id*. at 61-62.  Petitioner's request for the missing witness charge was ultimately denied.  *Id*. at 63.

The parties delivered their summations, the trial court instructed the jury on the law, and the jurors began deliberations.  Dkt. No. 14-3 at 64-109.  The jury unanimously found Petitioner guilty of two counts of Criminal Possession of a Weapon in the Second Degree and one count of Criminal Mischief in the Fourth Degree.  *Id.* at 123-26.

### C.  Sentencing

On March 18, 2016, Petitioner appeared before Onondaga County Supreme Court for sentencing. *See* Dkt. No. 14-4, Sentencing Transcript.  Petitioner stipulated to his status as a second felony offender.  *Id.* at 2.  The People asked the court to impose the maximum sentence of fifteen years and defense counsel asked the court to consider the minimum sentence.  *Id.* at 3-6.  Petitioner also made a statement wherein he apologized for his role in the crime.  *Id.* at 6-8.

Petitioner was sentenced to two concurrent determinate terms of eight years' imprisonment for his two Criminal Possession of a Weapon convictions, to be followed by five years of post-release supervision, and a one year term of imprisonment for the Criminal Mischief in the Fourth Degree conviction, to run concurrently with the other sentence imposed.  Dkt. No. 14-4 at 9.  The court ordered the three concurrent sentences to run consecutively to the sentence Petitioner was then serving.  *Id.*

### D.  Direct Appeal

Petitioner appealed his judgment of conviction to the Appellate Division, Fourth Department.  *See People v. Spagnualo*, 173 A.D. 1832 (4th Dep't 2019).[2]  In his

---

[2] *See also* SR 3-170 (Petitioner's Counseled Appellate Division Brief and Appendix), 171-200 (The People's Appellate Division Brief), 201-11 (Petitioner's Counseled Reply Brief), 212-40 (Petitioner's Pro Se Appellate Division Brief and Exhibits).  Of note, Petitioner's surname is spelled inconsistently throughout the State Court records.  This Court uses Spagnuolo (not Spagnuola), the spelling used by Petitioner in his Petition, throughout this Report-Recommendation and Order, including in citations to the State Court decisions.

counseled brief, Petitioner argued: (1) he was denied the effective assistance of counsel because trial counsel failed to timely request a missing witness instruction (SR 14-21); (2) the jury's verdict was against the weight of the evidence (SR 22-33); and (3) his sentence was harsh and severe (SR 34-38).  The People responded: (1) defense counsel provided effective assistance and, even if a missing witness charge had been timely requested, it would have been denied (SR 186-93); the jury's verdict was supported by the weight of the evidence (SR 193-97); and (3) Petitioner's sentence was neither unduly harsh nor severe (SR 197-98).  In a counseled reply brief, Petitioner averred a request for a missing witness instruction would have been granted had it been timely requested and trial counsel's late request had no strategic purpose.  SR 205-10. Petitioner also filed a pro se brief, wherein he argued the evidence presented at trial was insufficient to support his convictions.  SR 228-38.

On June 28, 2019, Appellate Division unanimously affirmed Petitioner's conviction.  *Spagnualo*, 173 A.D. at 1832.[3]  Petitioner applied for leave to appeal the Fourth Department's decision to the Court of Appeals.  SR 247-52.  The People opposed Petitioner's application.  SR 253-55.  On September 19, 2019, the Court of Appeals denied Petitioner's leave application.  *People v. Spagnualo*, 34 N.Y.3d 954 (2019).[4]

---

[3] A copy of the Fourth Department's Memorandum and Order affirming Petitioner's judgment of conviction is also included in the State Court Record.  *See* SR 243-245.

[4] A copy of the Court of Appeals' Order denying Petitioner's leave application is also included in the State Court Record.  *See* SR 257.

### III.    PETITION

Petitioner challenges his 2016 judgment of conviction of two counts of Criminal Possession of a Weapon in the Second Degree and one count of Criminal Mischief in the Fourth Degree following a jury trial in Onondaga County Supreme Court.   *See* Pet.; SR 163, Verdict Sheet.  Petitioner avers he is entitled to federal habeas relief because: (1) the trial court erred in denying his request for a missing witness charge (Pet. at 5-7); (2) he was denied the effective assistance of counsel when trial counsel failed to request a missing witness charge at the earliest opportunity to do so (Pet. at 7-8); (3) the jury's verdict was against the weight of the evidence (Pet. at 8-10); and (4) the trial court's imposition of an eight year sentence was harsh and excessive (Pet. at 10-11). Respondent argues: (1) Petitioner's challenge to the trial court's denial of his request for a missing witness charge is both procedurally barred and not cognizable on habeas review (Dkt. No. 13-1 at 19-26); (2) the Appellate Division reasonably applied *Strickland* in rejecting Petitioner's ineffective assistance claim (Dkt. No. 13-1 at 26-28); (3) Petitioner's weight of the evidence claim is not cognizable on habeas review (Dkt. No. 13-1 at 28-32); and (4) Petitioner's excessive sentence claim is not cognizable on habeas review (Dkt. No. 13-1 at 32).

### IV.    DISCUSSION

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based upon the record before the state court, the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or

(2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); *Premo v. Moore*, 562 U.S. 115, 120-21 (2011); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  This standard is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt."  *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (internal quotation marks and citation omitted).  "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

## A.    Denial of Petitioner's Request for a Missing Witness Charge

Petitioner first argues he is entitled to habeas corpus relief because "the lower court erred in denying defense counsel[']s timely request for a missing witness charge." Pet. at 5-7.  Respondent contends Petitioner's claim is unexhausted and procedurally barred and, in any event, does not constitute a cognizable federal habeas claim.  Dkt. No. 13-1 at 19-26.

An application for a writ of habeas corpus may not be granted until a petitioner has exhausted all remedies available in state court unless "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant."  28 U.S.C. § 2254(b)(1)(A)-(B)(ii).  To satisfy the exhaustion requirement, a petitioner must do so both procedurally and substantively.  Procedural exhaustion requires a petitioner raise all claims in state court prior to raising them in a federal habeas corpus petition.  *O'Sullivan v. Boerckel*, 526

U.S. 838, 845 (1999).  Substantive exhaustion requires a petitioner "fairly present" each claim for habeas relief in "each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted).  In other words, a habeas Petitioner is required to "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 845.

Petitioner's claim– the trial court erred in denying his request for a missing witness charge –was not raised in state court prior to the instant petition.  *See generally*, SR 3-39 (Petitioner's Counseled Brief to the Appellate Division), 201-11 (Petitioner's Counseled Reply Brief), 222-40 (Petitioner's Supplemental Pro Se Brief to the Appellate Division).  While Petitioner argued he was denied the effective assistance of counsel based on "defense counsel's late request for a missing witness instruction"– SR 14 – Petitioner did not claim the trial court's failure to grant defense counsel's request was improper.  *See* SR 14-21.  Therefore, Petitioner's claim was neither procedurally nor substantively exhausted.

"For exhaustion purposes, 'a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred.'"  *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991) (quoting *Harris v. Reed*, 489 U.S. 255, 263 n. 9 (1989)) (additional citations omitted).  As explained by the Second Circuit Court of Appeals:

> When a claim has never been presented to a state court, a federal court may theoretically find that there is an "absence of available State corrective process" under § 2254(b)(1)(B)(i) if it is clear that the unexhausted claim is

> procedurally barred by state law and, as such, its
> presentation in the state forum would be futile.

*Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001). A Petitioner's unexhausted

constitutional claim is procedurally barred under New York law where it was not

included in the Petitioner's "completed . . . direct appeal and the nature of the claim is

apparent from the face of the record, meaning that he would be barred from raising it in

a motion to vacate the judgment." *Jackson v. Conway*, 763 F.3d 115, 143 (2d Cir.

2014) (citing N.Y. Crim. Proc. Law § 440.10(2)(c); *Sweet v. Bennett*, 353 F.3d 135, 140

(2d Cir. 2003) ("New York law requires a state court to deny a motion to vacate a

judgment based on a constitutional violation where the defendant unjustifiably failed to

argue the constitutional violation on direct appeal despite a sufficient record.") (citation

omitted)).

The basis of Petitioner's challenge to the trial court's ruling– the trial court's

refusal to provide the requested missing witness charge –is apparent on the record;

therefore, it should have been raised on direct appeal. Because Petitioner failed to

include this claim in his completed direct appeal, he could not now raise it in a motion to

vacate. Accordingly, Petitioner's challenge to the trial court's ruling is procedurally

barred by state law and its presentation in a New York court would be futile. *Aparicio*,

269 F.3d at 90.

"[I]f the petitioner failed to exhaust state remedies and the court to which the

petitioner would be required to present his claims in order to meet the exhaustion

requirement would now find the claims procedurally barred . . . there is a procedural

default for purposes of federal habeas[.]" *Coleman v. Thompson*, 501 U.S. 722, 735 n.

1 (1991) (citations omitted).[5]  Because Petitioner cannot present this claim in a New

York court to satisfy the exhaustion requirement, the claim is procedurally defaulted.

*See, e.g.*, *Curtis v. Gonyea*, No. 9:19-CV-1164 (BKS), 2020 WL 5122395, at *3

(N.D.N.Y. Aug. 31, 2020) (explaining the petitioner's challenge to the trial court's

decision denying petitioner's motion to suppress statements was "procedurally defaulted

because petitioner can no longer raise it in any state forum" where the petitioner did not

raise his claim, which "was reviewable from the record," on direct appeal; therefore, the

petitioner would be barred from raising it in a motion to vacate).

        The Supreme Court has held where, as here, "a state prisoner has defaulted his

federal" constitutional claim:

> Federal habeas review of the claim[] is barred unless the
> prisoner can demonstrate cause for the default and actual
> prejudice as a result of the alleged violation of federal law, or
> demonstrate that failure to consider the claim[] will result in a
> fundamental miscarriage of justice.

*Coleman*, 501 U.S. at 750.  To satisfy the "cause" requirement, Petitioner must show

"some objective factor external to the defense impeded counsel's efforts to raise the

claim in state court."  *Levine v. Comm'r of Corr. Servs.*, 44 F.3d 121, 127 (2d Cir. 1995).

Petitioner has failed to even suggest an external factor prevented him from including

this claim in his direct appeal.  Because Petitioner "has not alleged or stated any other

facts that would support a finding of cause for his procedural default . . . this Court need

not decide whether he also suffered actual prejudice[.]"  *Camerena v. Bradt*, No. 9:07-

CV-1306 (TJM/RFT), 2010 WL 5579880, at *10 (N.D.N.Y. Dec. 22, 2010) (explaining

"federal habeas relief on the basis of a procedurally defaulted claim is unavailable

---

[5] The procedural default doctrine applies whether the default occurred at trial, on appeal or on state
collateral review.  *Murray v. Carrier*, 477 U.S. 478, 490-92 (1986).

unless *both* cause and prejudice are demonstrated." (emphasis added)), *report and recommendation adopted*, 2011 WL 124507 (N.D.N.Y. Jan. 14, 2011).

Alternatively, there is an exception to the procedural bar in cases where a petitioner can prove actual innocence. *See McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013); *see also House v. Bell*, 547 U.S. 518, 536-39 (2006) (explaining "prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt[.]'") (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). However, Petitioner has failed to allege, much less prove, he is actually innocent of the crimes for which he was convicted. Accordingly, federal habeas review of this claim is barred. *Coleman*, 501 U.S. at 750.[6]

### B.   Ineffective Assistance of Trial Counsel

Petitioner next contends habeas relief is warranted because trial counsel's failure to promptly request a missing witness charge deprived him of the effective assistance of counsel. Pet. at 7-8.[7]  Respondent argues the State Court's application of *Strickland* in denying Petitioner's ineffective assistance of counsel claim on direct appeal was not unreasonable. Dkt. No. 13-1 at 26-28.

---

[6] Because federal habeas review of this claim is barred, the undersigned need not address Respondent's additional argument that Petitioner's challenge to the trial court's denial of his request for a missing witness charge does not present a cognizable federal habeas claim.

[7] On direct appeal, Petitioner argued he was deprived of the effective assistance of counsel based on defense counsel's failure to request a missing witness charge for the People's failure to call both Kosmetatos and Donze. *See, e.g.*, SR 18 (arguing "both Kosmetatos and Donze . . . would have provided testimony that was material to the trial because they were both involved in conversations on the porch that formed the alleged agreement[.]"). In the instant matter, however, Petitioner's ineffective assistance of counsel claim is limited to defense counsel's failure to timely request a charge based on the prosecution's failure to call Donze. *See* Pet. at 7.

To prove he was denied the effective assistance of counsel, a convicted defendant must demonstrate: (1) "counsel's performance was deficient" and (2) counsel's "deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In order to demonstrate counsel's performance was deficient, "a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2010) (quoting *Strickland*, 466 U.S. at 688). Under the second prong, "[t]o establish *Strickland* prejudice a defendant must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Lafler v. Cooper*, 566 U.S. 156, 163 (2012) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Harrington*, 562 U.S. at 105. When evaluating an ineffective assistance claim on habeas review, "the question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect[,] but whether that determination was unreasonable— a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro*, 550 U.S. at 473) (internal quotations omitted). Therefore, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

On direct appeal, the Fourth Department concluded denial of a missing witness charge as to Donze would have been proper; therefore, defense counsel's failure to timely request such a charge did not constitute ineffective assistance, explaining testimony at trial established:

> [Donze] did not overhear the conversation that was at the heart of [Petitioner's] request for a missing witness charge, and it is well settled that a "request for a missing witness charge is properly denied where, as here, the party requesting the charge does not establish that the witness could have been expected to testify concerning a material issue" . . . With respect to the remainder of the events for which that potential witness was allegedly present, we conclude, based on the evidence in the record, that [Donze's] testimony would have been "trivial or cumulative[.]"

*Spagnualo*, 173 A.D. at 1833 (additional quotations and citations omitted).[8]  Petitioner avers the Appellate Division's application of *Strickland* was unreasonable because "[a]t trial[,] it was established that . . . Donze was present for conversations that confirmed the petitioner did not plan to kill . . . Luke[;]" therefore, when "[d]efense counsel became aware that Donze was not on the [People's] witness list . . . counsel should have made a request for a missing witness charge."  Pet. at 7.

Defense counsel's failure to make a request which would not have been granted cannot constitute ineffective assistance.  *See Bierenbaum v. Graham*, 607 F.3d 36, 52 (2d Cir. 2010) (holding "[t]he state court['s] conclu[sion] . . . that defense counsel was not ineffective for failing to" make a "motion [which] would not have been granted . . . was a reasonable application of *Strickland*" and affirming denial of federal habeas relief); *see also, e.g.*, *McKinney v. Burge*, No. 9:04-CV-1150 (GTS/DEP), 2009 WL

---

[8] Alternatively, the Appellate Division held "'even if counsel erred in submitting his request too late, this mistake was not so egregious and prejudicial as to constitute one of the rare cases where a single error results in ineffectiveness[.]'"  *Spagnualo*, 173 A.D. at 1834 (citations omitted).

666396, at *37 (N.D.N.Y. Mar. 10, 2009) ("Since any request to charge lesser included offenses in all likelihood would have been denied, petitioner was not prejudiced by trial counsel's failure to make such a request."); *Emmons v. Artus*, No. 9:09-CV-0675 (DNH/DRH), 2011 WL 841345, at *11 (N.D.N.Y. Jan. 10, 2011), *report and recommendation adopted*, 2011 WL 841316 (N.D.N.Y. Mar. 8, 2011) ("Trial counsel was [n]ot ineffective for failing to make what would have amounted to a futile speedy trial motion . . . . As such a motion would have been denied, defendant suffered no prejudice by his counsel's strategic decision not to proffer a futile motion[.]") (citation omitted), *affirmed*, 494 F. App'x 127 (2d Cir. 2012).

"A 'missing witness' charge allows the jury to draw an unfavorable inference based on a party's failure to call a witness who would normally be expected to support that party's version of the facts." *Robinson v. Graham*, 671 F. Supp. 2d 338, 350 (N.D.N.Y. 2009) (citing *People v. Savinon*, 100 N.Y.2d 192 (2003)). Under New York law, to be entitled to such a charge, a defendant must prove: "(1) the witness had knowledge material to the trial; (2) the witness would naturally be expected to give noncumulative testimony favorable to the party who failed to call the witness; and (3) the witness is available to the party who would be expected to call the witness." *Id*. (citing *People v. Gonzalez*, 68 N.Y.2d 424 (1986)); *see also Baptiste v. Ercole*, 766 F. Supp. 2d 339, 364-66 (N.D.N.Y. 2011) (concluding "the Appellate Division's rejection of Petitioner's claim that trial counsel was ineffective was not contrary to or an unreasonable application of clearly established Supreme Court precedent" where "the Appellate Division found[] Petitioner[] . . . failed to demonstrate his entitlement to a missing witness charge" noting "[t]o be entitled to a missing witness charge under New

York law, Petitioner had to show [the witness] was[:] knowledgeable about issues material to the trial, . . . expected to give non-cumulative testimony favorable to the prosecution, and . . .  available to the prosecution.") (citations omitted).

Here, Petitioner has failed to demonstrate Donze would have given "non-cumulative testimony favorable to the prosecution" as is required to be entitled to a missing witness charge.  Petitioner avers "Donze was present for conversations that confirmed [P]etitioner did not plan to kill . . . Luke"– Pet. at 7 –but Petitioner has failed to articulate how Donze's testimony would have been "*favorable to the prosecution*." *Baptiste*, 766 F. Supp. 2d at 364 (emphasis added); *see also Dearstyne v. Mazzuca*, 48 F. Supp. 3d 222, 275-76 (N.D.N.Y. 2011) (explaining "a missing witness charge is appropriate when the missing witness would naturally be expected to provide noncumulative testimony *favorable to the party who has not called him*" and denying Petitioner's ineffective assistance of counsel claim based on trial counsel's failure to request a missing witness charge, noting "[t]here [wa]s no suggestion that [the witness]'s testimony would have been favorable to the prosecution. Indeed, Petitioner's argument [wa]s to the contrary, i.e., that [the witness]'s testimony would have been favorable to the defense.") (internal quotations and citation omitted, emphasis in original).

Moreover, while Donze could have provided testimony about subjects other than the statements allegedly made by Petitioner, as the Appellate Division acknowledged, "[Donze's] testimony would have been 'trivial or cumulative.'"  *Spagnualo*, 173 A.D. at 1833 (additional quotations and citation omitted).  Indeed, Petitioner has failed to identify an occurrence observed by Donze for which Soble, who did testify for the

People, was not also present. Soble's testimony established Donze did not accompany Petitioner and Kosmetatos for the conversation which followed Kosmetatos' offer to do "any work" for Petitioner. *See* Dkt. No. 14-2 at 90. Therefore, any testimony provided by Donze about Petitioner's exchange with Kosmetatos would not have differed from Soble's testimony.

For the remaining events which occurred on September 2, 2014,– including the journey to Nice-N-Easy, Petitioner's withdrawal of cash, discussions which occurred inside the store, the commute to Luke's house, and the return to Nice-N-Easy –Soble and/or Cross, both of whom testified for the People, were with Donze. Cross testified she was the driver of the red Cadillac vehicle which Donze traveled in for the initial drive to Nice-N-Easy, to Luke's house, and then back to the Nice-N-Easy. *See* Dkt. No. 14-2 at 146-152. Soble testified he was present for both the first conversation at Nice-N-Easy between himself, Donze, and Petitioner, and the later exchange which followed the trip to Luke's residence. *See id*. at 92-94, 98-101. Cross and Soble's accounts of the events would have rendered an identical account provided by Donze cumulative. *See Horton v. Ercole*, 557 F. Supp. 2d 308, 329-30 (N.D.N.Y. 2008) (finding trial counsel was not ineffective for failing to request a missing witness instruction where "any testimony" provided by the witnesses for whom the request was instructed would have been "cumulative.") (citations omitted).

In sum, Petitioner cannot establish a missing witness charge was warranted; therefore, trial counsel's failure to timely request such a charge did not constitute ineffective assistance. Because the Appellate Division's determination was not an

"unreasonable" application of *Strickland*, Petitioner is not entitled to habeas relief on his ineffective assistance claim.

### C.      Weight of the Evidence and Legal Sufficiency

Petitioner next argues the jury's verdict was against the weight of the evidence. Pet. at 8-10.  Respondent contends Petitioner's weight of the evidence claim is not cognizable on habeas review, and to the extent such claim could be read as a challenge to the legal sufficiency of the People's case, it should be denied as procedurally barred. Dkt. No. 13-1 at 28-32.

#### 1.    Petitioner's Weight of the Evidence Claim is Not Cognizable on Habeas Review

"[T]he argument that a verdict is against the weight of the evidence states a claim under state law, which is not cognizable on habeas corpus" review.  *McKinnon v. Superintendent, Great Meadow Corr. Facility*, 422 F. App'x 69, 75 (2d Cir. 2011) (Summary Order) (citing *Correa v. Duncan*, 172 F.Supp.2d 378, 381 (E.D.N.Y. 2001)) (additional citations omitted); *see also Gethers v. Superintendent*, No. 9:18-CV-1262 (BKS/DJS), 2021 WL 7161870, at *2 (N.D.N.Y. Aug. 17, 2021) ("While arguments as to the legal sufficiency of evidence are cognizable in federal court under habeas corpus review, 'weight of the evidence' arguments are founded in New York Criminal Procedure Law § 470.15(5), and thus are not cognizable.") (citations omitted), *report and recommendation adopted*, 2022 WL 122778 (N.D.N.Y. Jan. 13, 2022).  Therefore, "Petitioner's claim that his conviction was against the weight of the evidence is not a basis for habeas relief."  *Garrett v. Perlman*, 438 F. Supp. 2d 467, 470 (S.D.N.Y. 2006).

### 2. Any Legal Sufficiency Claim Must be Dismissed as Procedurally Defaulted

However, "[b]ecause [Petitioner] is a pro se litigant, we read his supporting papers liberally, and will interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (citation omitted). Petitioner's third claim, arguing "the prosecution failed to prove that [P]etitioner possessed intent to commit Criminal Possession of a weapon[,]" can be liberally read as a challenge to the legal sufficiency of the evidence. *See generally*, *Garbez v. Greiner*, No. 1:01-CV-9865, 2002 WL 1760960, at *8 (S.D.N.Y. July 30, 2002) (explaining, "a challenge to a verdict based on the weight of the evidence is different from one based on the sufficiency of the evidence" because a challenge to the verdict based on a "'weight of the evidence' argument is a pure state law claim . . . whereas a legal sufficiency claim is based on federal due process principles.") (citing *People v. Bleakley*, 69 N.Y.2d 490 (1987)); *see also McKinnon*, 422 F. App'x at 75 ("as a matter of federal constitutional law a jury's verdict may . . . be overturned if the evidence is insufficient to permit any rational juror to find guilt beyond a reasonable doubt[.]) (citing *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *Policano v. Herbert*, 507 F.3d 111, 116 (2d Cir. 2007)).

In his pro se supplemental brief to the Appellate Division, Petitioner argued the evidence presented at trial was "insufficient to support [(1)] the [conclusion] that [Petitioner possessed] the . . . specific intent to use [a] weapon unlawfully against another" and (2) "the element of possession[.]" SR 231, 236. The Fourth Department denied Petitioner's legal sufficiency challenge, finding Petitioner "failed to preserve that contention inasmuch as his motion for a trial order of dismissal was not 'specifically

directed' at the issue raised on appeal . . . [and, i]n any event, [Petitioner]'s contention lacks merit[.]"  *Spagnualo*, 173 A.D. at 1834 (citations omitted).

A "federal habeas court will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'"  *Walker v. Martin*, 562 U.S. 307, 315 (2011) (quoting *Beard v. Kindler*, 558 U.S. 53, 55 (2009)) (additional citations omitted).  "This rule applies whether the state law ground is substantive or procedural."  *Coleman*, 501 U.S. at 729 (citation omitted).  Further, "federal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, *even where the state court has also ruled in the alternative on the merits* of the federal claim."  *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990) (emphasis added); *see also Hughes v. Sheahan*, 312 F. Supp. 3d 306, 340 (N.D.N.Y. 2018) (explaining "[e]ven if the state court considers the merits of an otherwise precluded claim, its reliance on a procedural ground as one basis for the denial of the claim precludes federal habeas review.") (citations omitted).  Accordingly, federal habeas review of Petitioner's legal sufficiency challenge will be barred if the Fourth Department's reliance on New York's preservation rule to deny Petitioner's claim on direct appeal was "independent of the federal question and adequate to support the judgment."  *Coleman*, 501 U.S. at 729 (1991).

The Second Circuit has held New York's preservation rule "is a state law ground . . . independent of any federal question[.]"  *Garvey v. Duncan*, 485 F.3d 709, 720 (2d Cir. 2007).  Therefore, the Fourth Department's application of the preservation rule was independent of the federal question presented here, *i.e.*, the legal sufficiency of the

evidence supporting Petitioner's conviction. "To qualify as an 'adequate' procedural ground, a state rule must be 'firmly established and regularly followed.'" *Walker*, 562 U.S. at 316 (citation omitted). Courts in this circuit have consistently found New York's preservation rule to be "firmly established and regularly followed." *See Downs v. Lape*, 657 F.3d 97, 104 (2d Cir. 2011) (collecting cases).

Accordingly, the Appellate Division's denial of Petitioner's legal sufficiency claim based on his failure to properly preserve it, as required by New York law, constitutes an independent and adequate state law ground precluding habeas review. Furthermore, for the reasons explained above, Petitioner has failed to demonstrate either cause for the procedural default of any unraised claims and prejudice, or prove actual innocence. Therefore, a legal sufficiency claim liberally read from the instant petition must be denied as procedurally barred. *See, e.g.*, *Mesko v. Lilley*, No. 9:18-CV-872 (GTS), 2019 WL 6493976, at *5-6 (N.D.N.Y. Dec. 3, 2019) (holding the petitioner's legal sufficiency claim was procedurally defaulted where "[t]he Appellate Division stated that petitioner['s] . . . 'challenge to the legal sufficiency of the evidence presented [wa]s unpreserved'" and the peitioner failed to "ma[k]e the required showing of cause and prejudice or actual innocence to overcome the procedural bar to having his defaulted claim addressed by th[e federal] Court.").

**D.    Excessive Sentence**

Finally, Petitioner contends the sentence imposed is harsh and excessive. Pet. at 10-11. Respondent avers Petitioner's excessive sentence claim is not cognizable on federal habeas review. Dkt. No. 13-1 at 32.

"No federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law." *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) (citation omitted); *see also Townsend v. Burke*, 334 U.S. 736, 741 (1948) ("The sentence being within the limits set by the statute, its severity would not be grounds for relief here even on direct review of the conviction, much less on review of the state court's denial of habeas corpus."); *Grimes v. Lempke*, No. 9:10-CV-0068 (GLS/RFT), 2014 WL 1028863, at *3 (N.D.N.Y. Mar. 14, 2014) ("It is well settled that the issue of whether a sentence was overly harsh or excessive is not a proper issue for review in the habeas context unless the sentence was outside of the permissible range provided for by state law.") (citing *White*, 969 F.2d at 1383).

Under New York law, "criminal possession of a weapon in the second degree as defined in section 265.03" is a "Class C violent felony offense[.]"  P.L. § 70.02(1)(b).[9] "For a class C violent felony offense, the term must be at least five years and must not exceed fifteen years" where "a person is a second felony offender."  *Id*. § 70.06(6)(b).[10] Accordingly, Onondaga County Supreme Court was authorized to sentence Petitioner to a maximum determinate term of fifteen years' imprisonment for his Criminal Possession of a Weapon in the Second Degree convictions.

Petitioner was sentenced to determinate terms of eight years' imprisonment for each of his Criminal Possession of a Weapon in the Second Degree convictions, to run concurrently to each other.  Dkt. No. 14-4 at 9.  Therefore, the sentences imposed by

---

[9] *See generally*, P.L. §§ 265.03(1)(b) ("A person is guilty of criminal possession of a weapon in the second degree when . . . with intent to use the same unlawfully against another, such person . . . possesses a loaded firearm[.]"), 265.03 (3) ("A person is guilty of criminal possession of a weapon in the second degree when . . . such person possesses any loaded firearm[.]"); SR 54 (Indictment).

[10] *See also* Dkt. No. 14-4 at 2 (Petitioner stipulating to his status as a second felony offender at sentencing hearing).

Onondaga County Supreme Court fall within the range proscribed by state law.[11]

Accordingly, Petitioner's excessive sentence claim provides no grounds for federal

habeas relief.  *See, e.g.*, *Rodriguez v. Griffin*, No. 9:16-CV-1037 (DNH), 2018 WL

6505808, at *24 (N.D.N.Y. Dec. 11, 2018) ("[Petitioner]'s . . . sentences . . . fall within

the limits set by New York law and therefore petitioner's claim provides no grounds for

federal habeas relief.").

## V.   CONCLUSION

**WHEREFORE**, it is

**RECOMMENDED** that the petition, Dkt. No. 1, be **DENIED and DISMISSED** in

its entirety; and it is further

**RECOMMENDED** that no Certificate of Appealability ("COA") shall issue

because reasonable jurists would not find it debatable that Petitioner has failed to offer

a substantial showing that he was denied a constitutional right.  *See* 28 U.S.C. §

2253(c); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000).

**ORDERED** that the Clerk shall serve a copy of this Report-Recommendation and

Order on Petitioner, along with copies of unpublished decisions cited herein in

accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within

which to file written objections to the foregoing report. Such objections shall be filed with

---

[11] Additionally, "criminal mischief in the fourth degree is a class A misdemeanor."  P.L. § 145.00.  "A sentence of imprisonment for a class A misdemeanor . . . shall be fixed by the court, and shall not exceed one year[.]"  *Id*. § 70.15(1).  Therefore, Supreme Court's imposition of a one year sentence for Petitioner's Criminal Mischief in the Fourth Degree conviction– ordered to run concurrently with the sentences imposed for Criminal Possession of a Weapon –similarly provides no basis for federal habeas corpus relief.

the Clerk of the Court.[12] **FAILURE TO OBJECT TO THIS REPORT WITHIN**

**FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*,

984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892

F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72 & 6(a).

       **IT IS SO ORDERED**.

Dated:      August 4, 2023
                Syracuse, New York

                                     Therese Wiley Dancks
                                       United States Magistrate Judge

---

[12] If you are proceeding *pro se* and are served with this Report-Recommendation and Order and by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen (17) days from the date the Report-Recommendation and Order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).